**UNITED STATES of America,**
**Plaintiff,**

v.

**The TIMES MIRROR COMPANY,**
**Defendant.**

**Civ. No. 65-366-F.**

United States District Court
C. D. California.

Oct. 11, 1967.

Bernard M. Hollander, John W. Poole, Jr., Joseph A. Tate, Department of Justice, Washington, D. C., for plaintiff.

Gibson, Dunn & Crutcher, Julian O. von Kalinowski, Paul G. Bower, Los Angeles, Cal., Robert F. Erburu, Los Angeles, Cal., of counsel, for defendant.

## OPINION

FERGUSON, District Judge.

This action was commenced on March 5, 1965, when the government filed its

complaint in a civil action alleging that the acquisition on June 25, 1964, by The Times Mirror Company of all the shares of stock of The Sun Company for $15,000,000 violates the antitrust laws of the United States.

The government challenges the acquisition by the publisher of the largest daily newspaper in Southern California (the Los Angeles Times) of the largest independent daily newspaper publisher in Southern California (The Sun Company). It contends that Times Mirror's acquisition and ownership of the stock of The Sun Company constitutes an unlawful control and combination which unreasonably restrains interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1[1], and that the effect of the acquisition may be to substantially lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.[2]

The government seeks an order of divestiture and an injunction which would prohibit the defendant from purchasing any other newspaper in the relevant geographic market.

Venue is in this court by reason of the fact that The Times Mirror Company, a California corporation, transacts business in the Central District of California and has its principal office in Los Angeles. 15 U.S.C. § 22.

*The Acquiring Company.*

The Times Mirror Company is a highly diversified holding company with large interests in newspaper publishing, book publishing and commercial printing. Between 1960 and 1964, its total assets increased from $81,014,000 to $165,162,-000, its revenues rose from $112,560,000 to $196,537,000 and its earnings after taxes more than doubled. A large part of its growth is attributed to a number of acquisitions.

When it acquired The Sun Company, Times Mirror published the Los Angeles Times, mornings and Sundays, and through its wholly-owned subsidiary, Orange Coast Publishing Company, published the Orange Coast Daily Pilot, an evening newspaper published in four editions in the beach area south of Los Angeles.

The Los Angeles Times, which is The Times Mirror Company's principal enterprise, has been in terms of circulation the largest daily newspaper published in California since 1948 (790,255 in 1964), and the largest Sunday newspaper since 1951 (1,122,143 in 1964). It has led all newspapers in the United States in total annual daily and Sunday advertising lineage since 1955 and in total annual editorial and feature matter lineage since 1951. It has advertising offices not only in California but also in Chicago and New York. It operates the Los Angeles Times Syndicate, which distributes and sells approximately 35 newspaper features in more than 1,000 publications throughout the world, and through the Los Angeles Times-Washington Post News Service, provides news to about 90 daily newspapers.

Although it is published in Los Angeles, it circulates in substantial numbers and is home delivered throughout Southern California, and maintains advertising offices and reporters, full and part-time, throughout.

As to syndicated features which it purchases, the Times has followed a policy of obtaining exclusive rights in the

---

1. Section 1 of the Sherman Act, 15 U.S.C. § 1, provides in pertinent part:
 "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal * * *."

2. Section 7 of the Clayton Act, 15 U.S.C. § 18, provides in pertinent part:

"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital * * * of another corporation engaged also in commerce, where in any line of commerce in any section of the country the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

area of Santa Barbara on the north to San Diego on the south and to the Colorado River on the east; its policy has been and is to deny use of such features to other daily newspapers in its exclusive area.

In recent years, the Times has published five suburban or zone sections, each of which is distributed as part of the Times in a specific geographic area, their purpose being to compete with local newspapers in those areas for circulation and advertising. These suburban sections, which carry local news of the specific area in which they are distributed, also carry advertising at lower rates than are charged for the full run of the paper.

The Los Angeles Times is a newspaper with special focus on the interpretation of news and issues and specialization in financial news, entertainment, art, sports and special interest subjects. It has 17 exclusive bureaus in various parts of the world and 12 full-time reporters in the nation's capital, as well as national bureaus in such places as New York, Chicago, Atlanta, Houston, Sacramento and San Francisco.

*The Acquired Company.*

At the time of the acquisition, The Sun Company was the largest independent newspaper publishing company in Southern California. The company was located in San Bernardino County, which adjoins Los Angeles County to the east. It was locally owned, primarily by the Guthrie family, and none of its owners had significant interests in other newspapers. The Sun Company was not only a prosperous publisher with morning, evening and Sunday newspapers, but it also owned Acme Colorprint Company which supplies color comic printing to most of the Southern California Sunday newspapers.

The Sun Company was in sound financial condition with total assets of $4,551,261 and its net income from newspaper operations in 1964 exceeded $1,-000,000. Each year from 1960 to 1964, its revenues from the operations of its newspapers and the Acme Colorprint Company approximated $8,000,000.

With its three newspapers, the morning Sun, the evening Telegram and the Sunday Sun-Telegram, The Sun Company dominated the daily newspaper business in San Bernardino County. The only difference between the Sun and the Telegram was that the first was published in the morning and the latter in the evening. Substantially, they were the same paper without change in editorial opinion, features or news. The combined weekday circulation of the Sun and the Telegram was nearly three times as large as that of the next largest daily published in the county and more than eight times as large as any other daily published there.

In 1964 the Sun was the only morning newspaper published daily in San Bernardino County. Its daily circulation was 53,802. The Sun-Telegram was the largest Sunday newspaper published there with a circulation of 70,664. They were the only newspapers other than the Los Angeles papers (the Times and the evening and Sunday Herald-Examiner) which were home delivered throughout San Bernardino County.

The Sun covered all of San Bernardino County with news and zone editions. In addition to a city zone for the City of San Bernardino and a free weekly advertising shopper, it distributed nine zone editions to specific areas of the county.

Both the morning Sun and the Sunday Sun-Telegram carried a substantial amount of state, national and international news, complete stock reports of the New York and American Stock Exchanges, national sports news, nationally known columnists, comics and other syndicated features, and Los Angeles television and radio logs. The Sun maintained editorial and advertising offices in the larger communities of San Bernardino County and purchased the whole of the county as exclusive territory for certain of its syndicated features.

*The Acquisition.*

Negotiations for the acquisition of The Sun Company by the defendant extended over several years on a sporadic basis. They were first begun by Norman Chandler, Chief Executive of Times Mirror, in 1962 when he contacted his long-time friend, James A. Guthrie, to inquire as to whether Mr. Guthrie was interested in selling. Mr. Chandler was interested in The Sun Company because it had a fine reputation and it was in a growth area that in the long run would prove to be a good investment. Mr. Guthrie was not interested. Subsequently, however, he informed Mr. Chandler that if he received an offer which was high enough he would consider selling. Further negotiations ensued, culminating in an offer of an exchange of stock which was not accepted.

In 1964 negotiations were resumed and a proposal was made by Times Mirror for $12.5 million in cash which was refused. In June, 1964, the Pulitzer Publishing Company of St. Louis made a cash offer to Mr. Guthrie of $15 million.

Mr. Guthrie realized the $15 million offer of Pulitzer could not be ignored. However, he preferred that The Sun Company be sold to Times Mirror for a number of reasons. First, he felt that the interests of Times Mirror and The Sun Company in the development of the West were the same. Second, Norman Chandler was a director of three of the largest corporations in San Bernardino County: Kaiser Steel Corporation, The Atchison, Topeka & Santa Fe Railroad and Safeway Stores, Inc. Third, he treasured the friendship that existed between the Chandler family and his family beginning in the days of General Otis. Finally, he disapproved of the Pulitzer policies and politics.

Because of the Pulitzer offer, Mr. Guthrie, Sr., asked his son, James K. Guthrie, to call Otis Chandler, Norman Chandler's son and the publisher of the Times, and inform him that an offer of $15 million had been made to purchase the newspaper and to say that if Times Mirror were truly interested they had better move quickly. Mr. Guthrie had made the decision to sell because of advice concerning his estate planning.

As a result of James K. Guthrie's phone call on June 20, 1964, Norman Chandler went to San Bernardino and conferred with Mr. Guthrie, Sr., at the latter's home. Mr. Guthrie told Mr. Chandler that he had received an offer of $15 million from the Pulitzers. Mr. Chandler stated, "We will meet the price of $15 million". They shook hands and five days later the sale was formally completed.

*Jurisdiction.*

The Times Mirror Company and The Sun Company are now and were at the time of the acquisition corporations engaged in interstate commerce.

Both company newspapers regularly publish news, features and other information gathered from outside California for dissemination to their readers; both sell advertising to out-of-state advertisers with the result that advertising materials, contracts, copy and payment cross state lines; and both disseminate this out-of-state advertising to their readers.

The Times Mirror Company and The Sun Company newspapers are members of the Associated Press and the United Press and, as such, are obligated to furnish news originating within their respective areas to these wire services for use by other newspaper members, many of which are outside of California.

The two companies have numerous agreements with out-of-state feature syndicates under which they are provided with features for publication in return for regular payment to said syndicates, and both use substantial amounts of newsprint produced and shipped from production facilities outside of California.

In describing the daily newspaper business in Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96

L.Ed. 162 (1951), the Supreme Court stated:

"There can be little doubt today that the immediate dissemination of news gathered from throughout the nation or the world by agencies specially organized for that purpose is a part of interstate commerce. Associated Press v. United States, 326 U.S. 1, 14 [65 S.Ct. 1416, 1421]; Associated Press v. [National Labor Relations] Board, 301 U.S. 103 [57 S.Ct. 650, 81 L.Ed. 953]. The same is true of national advertising originating throughout the nation and offering products for sale on a national scale. The local dissemination of such news and advertising requires continuous interstate transmission of materials and payments, to say nothing of the interstate commerce involved in the sale and delivery of products sold.

* * *

"The distribution within Lorain of the news and advertisements transmitted to Lorain in interstate commerce for the sole purpose of immediate and profitable reproduction and distribution to the reading public is an inseparable part of the flow of the interstate commerce involved. * * * Unless protected by law, the consuming public is at the mercy of restraints and monopolizations of interstate commerce at whatever points they occur. Without the protection of competition at the outlets of the flow of interstate commerce, the protection of its earlier stages is of little worth." 342 U.S. at 151–52, 72 S.Ct. at 185–86.

■ It is settled that the antitrust laws apply to the daily newspaper business. In Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945), the Court stated:

"Member publishers of AP are engaged in business for profit exactly as are other business men who sell food, steel, aluminum, or anything else people need or want. See International News Service v. Associated Press * * *. All are alike covered by the Sherman Act." 326 U.S. at 7, 65 S.Ct. at 1418.

The facts presented here differ markedly from those in Page v. Work, 290 F.2d 323 (9th Cir. 1961), where the newspaper involved was "primarily devoted to legal advertising [and] * * * carried insignificant quantities of national news and display advertising". 290 F.2d at 329.

*Purpose of Section 7.*

It is the conclusion of the court that the acquisition violates § 7 of the Clayton Act and full relief may be granted thereunder. It is therefore unnecessary to discuss § 1 of the Sherman Act.

■ The Supreme Court, in Brown Shoe Co. v. United States, 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962), pointed out in setting forth the legislative history of the 1950 amendment to § 7 of the Clayton Act that:

"The dominant theme pervading congressional consideration of the 1950 amendments was a fear of what was considered to be a rising tide of economic concentration in the American economy. Apprehension in this regard was bolstered by the publication in 1948 of the Federal Trade Commission's study on corporate mergers. * * * Other considerations cited in support of the bill were the desirability of retaining 'local control' over industry and the protection of small businesses. Throughout the recorded discussion may be found examples of Congress' fear not only of accelerated concentration of economic power on economic grounds, but also of the threat to other values a trend toward concentration was thought to pose." 370 U.S. at 315–16, 82 S.Ct. at 1518–19.

The Court declared:

1. Congress made it plain that § 7 applied not only to mergers between actual competitors, but also to vertical and conglomerate mergers whose effect may tend to lessen competition in any line of commerce in any sec-

tion of the country. 370 U.S. at 317, 82 S.Ct. at 1519.

2. The amendment provides authority for arresting mergers at a time when the trend to a lessening of competition in a line of commerce was still in its incipiency. 370 U.S. at 317, 82 S.Ct. 1519.

3. There are no particular tests for measuring the relevant product and geographic markets with which the anticompetitive effects of a merger were to be judged. 370 U.S. at 320–21, 82 S.Ct. 1521.

4. A merger must be functionally viewed in the context of its particular industry. 370 U.S. at 321–22, 82 S.Ct. 1521.

5. Congress used the words *"may be* substantially to lessen competition" (emphasis supplied) to indicate that its concern was with probabilities, not certainties. 370 U.S. at 323, 82 S.Ct. 1522.

Since *Brown Shoe,* supra, the Supreme Court has consistently set forth in specific holdings the intent of Congress.

■ In United States v. Philadelphia Nat'l Bank, 374 U.S. 321, 83 S.Ct. 1715, 10 L.Ed.2d 915 (1963), it was declared that § 7 requires not only an appraisal of the immediate impact of the merger on competition but also a prediction of the merger's effect on competitive conditions in the future to prevent the destruction of competition.

In United States v. El Paso Gas Co., 376 U.S. 651, 84 S.Ct. 1044, 12 L.Ed.2d 12 (1964), although the acquired company had not gained entry into California for its product, its effect as a potential supplier made it a substantial competitive factor in the expanding California market.

In United States v. Aluminum Co. of America, 377 U.S. 271, 84 S.Ct. 1283, 12 L.Ed.2d 314 (1964), it was held that the degree of competition between two products not only justified grouping them in a single product market for the purpose of analyzing the competi-tive aspects of a merger but also did not prevent their division into separate submarkets for § 7 purposes. 377 U.S. at 275, 84 S.Ct. 1283.

In United States v. Continental Can Co., 378 U.S. 441, 84 S.Ct. 1738, 12 L.Ed. 2d 953 (1964), the Court held that between two different industries there was "over the long run the kind of consumer response to innovation and other competitive stimuli that brings the competition between these two industries within § 7's competition-preserving proscriptions". 378 U.S. at 455, 84 S.Ct. at 1746.

In Federal Trade Commission v. Consolidated Foods Corp., 380 U.S. 592, 85 S.Ct. 1220, 14 L.Ed.2d 95 (1965), the Court found that reciprocal trading as a result of an acquisition violates § 7 if there is a probability of a lessening of competition.

In United States v. Von's Grocery Co., 384 U.S. 270, 86 S.Ct. 1478, 16 L.Ed.2d 555 (1966), the Court found a violation of § 7 when two powerful companies, although each having a small share in the market, merged in a market exhibiting a marked trend toward concentration.

In United States v. Pabst Brewing Co., 384 U.S. 546, 86 S.Ct. 1665, 16 L.Ed.2d 765 (1966), the Court held that proof of the section of the country where the anticompetitive effect exists is entirely subsidiary to the crucial § 7 issue, which is whether the merger may substantially lessen competition anywhere in the country.

In United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966), it was held that there is no barrier to combining in a single market a number of different products or services where the combination reflects commercial realities.

Finally, in Federal Trade Commission v. Procter & Gamble Co., 386 U.S. 568, 87 S.Ct. 1224, 18 L.Ed.2d 303 (1967), the Court held that any merger, whether it is horizontal, vertical, conglomerate or product-extension, must be tested by the

same standard of § 7, that is, whether it may substantially lessen competition.

*The Industry.*

Daily newspapers are classified into three classes or types: (1) community or local, (2) metropolitan and (3) regional.

A local newspaper serves its own community. It emphasizes local news, local issues and advertising. Although each community daily likes to think of itself as a primary newspaper, basically it will have a skeleton of national and international news from press associations which vary little from paper to paper. Such newspapers are newspapers of record for their communities, reporting births, deaths, marriages, social events and the like.

The uncontradicted evidence was surprising in regard to the power of the press. It was testified by Dr. Walter Wilcox, a professor in journalism at the University of California at Los Angeles and the defendant's expert witness on newspapers, that:

> "the newspaper, is, in fact, a captive of its community * * *; the newspaper must exist in the image of its community and it cannot in any significant degree change itself and depart from the requirements and needs of its community."

Dr. Wilcox notes that two newspapers published in the same community tend to be the same. Each newspaper will devote a certain amount of space to obituaries, to churches, to service clubs, etc., and will normally choose about the same package of national and international news. He described local newspapers as considering themselves to be primary newspapers, but in reality they are not. A primary newspaper is one which gives to its reader all the news and information he needs to be an informed person. Dr. Wilcox described local newspapers as not meeting that aspiration. He further explained in regard to national and international news there will not be any significant variation from one local newspaper to another.

Metropolitan newspapers serve a metropolitan complex which is an area of population concentration that has in it a number of communities. They put emphasis on the development in detail of national, international, regional and state news. Papers such as the Washington Post, the New York Times and the Los Angeles Times have handled this interpretive journalism through the widespread system of bureaus, developing the stories in depth and then explaining why events occur. They seek out the news that is of interest to the greatest number of readers rather than attempt to do a systematic job of covering the news of all the small communities within the metropolitan complex. However, as in the case of the Los Angeles Times, there has been a recent trend of establishing zone editions which feature local news, social news and advertising of the communities within the particular zone in order to increase circulation and advertising in the smaller communities.

A regional newspaper serves a vast region in a systematic way. Such a paper is usually found in areas that are to some degree still rural in character. It carries local news of its major community and, extensively and systematically, local news of the smaller communities in the region. Such papers are the Sacramento Bee, which serves Northern and Central California; the Salt Lake Tribune, which serves all of Utah and part of Idaho, Wyoming and Nevada; and the Des Moines Morning Register, which covers all of Iowa and part of Nebraska and South Dakota, bypassing larger communities like Iowa City and Cedar Rapids.

*The Product Market.*

In actions under § 7 of the Clayton Act, a finding of the appropriate "product market" is a necessary predicate to a determination of whether a merger has the requisite anticompetitive effects. In *Brown Shoe Co. v. United States, supra,* it is set forth:

> "Thus, as we have previously noted, '[d]etermination of the relevant market is a necessary predicate to a finding of a violation of the Clayton Act

because the threatened monopoly must be one which will substantially lessen competition "within the area of effective competition." Substantially can be determined only in terms of the market affected.'

"The 'area of effective competition' must be determined by reference to a product market (the 'line of commerce') and a geographic market (the 'section of the country')." 370 U.S. at 324, 82 S.Ct. at 1523.

The thrust of the defense to this action is that "there can be no appropriate product market which includes both the Times and the Sun because there is no cross-elasticity of demand between the two newspapers, and because they are not regarded as substitutes for one another for any of the services furnished by a newspaper".

In *Brown Shoe,* supra, in setting a guideline for the appropriate product market, the Court said:

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it." 370 U.S. at 325, 82 S.Ct. at 1523.

It is this sentence upon which the defendant bases its position. Its expert economic witness states that "If the price of one of the products goes up, * * *—and the other stays the same —one expects demand, if they are close substitutes, to be transferred from the commodity which is relatively high to the one which is relatively low." The defendant has pointed out that differences between the price raises of the Times and the Sun did not produce a significant change in circulation. However, as the Supreme Court pointed out in *United States v. Continental Can Co.,* supra, since demand is not particularly or immediately responsive to price changes, demand is not determinative of the product market issue under § 7 of the Clayton Act.

Furthermore, the defendant claims that the Times and the Sun are two distinct and different types of newspapers which do not compete with and are not substitutes for each other. It is contended that (1) they carry a different package insofar as local news is concerned; the Sun acts as a newspaper of record for its circulation area, whereas the Times has a horizontal coverage; (2) the Sun is locally oriented toward its community; it carries everything of significance that might happen in its immediate area; (3) the Times emphasizes departmentalization and specialization of the news; the Sun has no such approach; (4) the number, quality and extent of the Times' features could not be duplicated by the other newspapers in the area where it circulates because they are smaller and do not have the financial resources to do so; and (5) the outlying newspapers' foreign and national coverage tends to be straight wire service copy, with some supplementary news service, whereas the Times uses its own staff.

The reliance of the defendant upon the "reasonable interchangeability of use or the cross-elasticity of demand" test of *Brown Shoe* is unfounded. The balance of the paragraph in which the sentence is contained must be read in order to understand the rational tests which must govern whether there has been a § 7 violation. The entire paragraph is as follows:

"The outer boundaries of a product market are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it. However, within this broad market, well-defined submarkets may exist which, in themselves, constitute product markets for antitrust purposes. United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 593–595, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057. The boundaries of such a submarket may be determined by examining such practical indicia as industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct custom-

ers, distinct prices, sensitivity to price changes, and specialized vendors. Because § 7 of the Clayton Act prohibits any merger which may substantially lessen competition 'in *any* line of commerce' (emphasis supplied), it is necessary to examine the effects of a merger in each such economically significant submarket to determine if there is a reasonable probability that the merger will substantially lessen competition. If such a probability is found to exist, the merger is proscribed." 370 U.S. at 325, 82 S.Ct. at 1523.

 As stated in United States v. Continental Can Co., supra:

"Interchangeability of use and cross-elasticity of demand are not to be used to obscure competition but to 'recognize competition where, in fact, competition exists.'" 378 U.S. at 453, 84 S.Ct. at 1745.

In *Brown Shoe* itself, it was stated that one of the purposes of the 1950 amendment to § 7 was to make it apply not only to mergers between actual competitors but also to vertical and conglomerate mergers whose effect may tend to lessen competition in any line of commerce in any section of the country. 370 U.S. at 317, 82 S.Ct. 1502, 8 L.Ed.2d 510. In Federal Trade Commission v. Procter & Gamble Co., supra, there was no hesitancy in applying § 7 even though the products could not in any degree be considered as substitutes for each other. There, the products of the acquired company were only complementary to those of the acquiring company, yet the Court held that since the effect of the merger would be to lessen competition, the test of § 7 was met.

The argument that the Times and the Sun did not compete with each other and for that reason there could not be an antitrust violation has lost all its validity since the 1950 amendment. The fact that two merging companies presently compete or do not compete is not the significant issue. Congress has directed that the courts must look to the effect and impact of the merger. If its effect is anticompetitive, then there is a violation. As stated in United States v. Von's Grocery Co., supra:

"As we said in Brown Shoe Co. v. United States, 370 U.S. 294, 315 [82 S.Ct. 1502, 1518, 8 L.Ed.2d 510], 'The dominant theme pervading congressional consideration of the 1950 amendments was a fear of what was considered to be a rising tide of economic concentration in the American economy.' To arrest this 'rising tide' toward concentration into too few hands and to halt the gradual demise of the small businessman, Congress decided to clamp down with vigor on mergers. It both revitalized § 7 of the Clayton Act by 'plugging its loophole' and *broadened its scope so as not only to prohibit mergers between competitors, the effect of which 'may be substantially to lessen competition, or to tend to create a monopoly' but to prohibit all mergers having that effect.* (Emphasis supplied.) By using these terms in § 7 which look not merely to the actual present effect of a merger but instead to its effect upon future competition, Congress sought to preserve competition among many small businesses by arresting a trend toward concentration in its incipiency before that trend developed to the point that a market was left in the grip of a few big companies. Thus, where concentration is gaining momentum in a market, we must be alert to carry out Congress' intent to protect competition against ever-increasing concentration through mergers." 384 U.S. at 276–77, 86 S.Ct. at 1481.

It makes little difference when one newspaper acquires another what the merger is called, whether it be horizontal or product-extension. The issue is whether the effect is to substantially lessen competition in any section of the country. To claim that a reader will or will not buy a newspaper or shift his readership to another newspaper which is available to him is not the significant test under § 7. To characterize or not to

characterize one newspaper as a substitute for the other is to lose sight of the intent of Congress as plainly set forth in *Brown Shoe* and the subsequent Supreme Court cases which have cut across all contentions except the anticompetitive effect of the merger.

The daily newspaper business is a distinct line of commerce and is a product separate and distinct from any other product. It has sufficient peculiar characteristics and uses which make it distinguishable from all other products. Cf. United States v. E. I. du Pont de Nemours & Co., 353 U.S. 586, 593, 77 S.Ct. 872, 877, 1 L.Ed.2d 1057, 1066 (1957). A daily newspaper is a newspaper of general readership published at least five times a week. Daily newspapers have a unique market for which there is no real substitute. They have achieved industry and public recognition and utilize unique methods of production, distribution and pricing, all practical indicia for determining a product market.

The daily newspaper provides a cluster of services in one unique package. It provides readers with a daily written record of current events and reference information including vital statistics, public announcements, legal notices, box scores, stock market reports, weather reports, theater listings and radio and television logs. They provide more, wider and deeper coverage of all news —international, national and local—than any other medium of daily news dissemination. They offer a combination of syndicated features, such as comics, columnists and cartoons, not carried by any other medium. They provide readers with current advertising in greater depth and detail than any other medium. There are some classes of advertisers, such as grocery and department stores, which must rely upon daily newspapers for almost all their advertising.

The daily newspaper business has its own trade associations and societies, such as the American Newspaper Publishers Association and the American Society of Newspaper Editors, the membership of which is confined to publishers and editors of daily newspapers. It has its own trade journals, such as Editor and Publisher, in which statistics and records relating only to that business are reported. It has separate and distinct methods for reporting the readership coverage of various newspapers, as for example, ABC Audit Reports, Circulation '64, and SRDS Newspaper Circulation Analysis.

Within the daily newspaper market, there are three submarkets: the morning newspaper, the evening newspaper and the Sunday newspaper. The industry publishers, Editors and Publishers, Associated Press By-laws and Media Scope all recognize the morning newspaper as a separate category within the daily newspaper business. In addition, the newspaper circulation reporting services (Audit Bureau of Circulations, Standard Rate & Data Service and American Newspaper Markets) all report circulations separately for morning and evening newspapers.

Because morning dailies go to press during the night, they are distributed at a time when traffic on the streets is lighter and can therefore be circulated over a wider geographic area than can evening newspapers, and in a much shorter time. By reason of the fact that morning newspapers have approximately the same deadlines and because they are all offered for sale and distributed in the morning hours, morning newspapers tend to compete more vigorously for circulation with each other than they do with evening papers.

Little need be said as to why the Sunday newspaper is a submarket. Any reader recognizes the difference in price, style and content with special Sunday features and supplements. The newspaper industry by its publications recognizes the separate category.

In the final analysis, the daily newspaper business is a commercial reality which is universally recognized as a line of commerce. The following from Crown Zellerbach Corp. v. Federal Trade Commission, 296 F.2d 800 (9th Cir. 1961),

cert. denied, 370 U.S. 937, 82 S.Ct. 1581, 8 L.Ed.2d 807 (1962), is appropriate:

> "[A]s a practical matter no one in the industry or interested in it or having anything to do with it has any difficulty in distinguishing [it] * * *." 296 F.2d at 813.

In some of the services which they provide, daily newspapers compete with other media, such as radio and television, both for news and advertising. This does not mean, however, that all competitors of any service provided by a daily newspaper must be lumped into the same line of commerce with it. Although "[f]or every product, substitutes exist. * * * a relevant market cannot meaningfully encompass that infinite range." United States v. Continental Can Co., 378 U.S. at 449, 84 S.Ct. at 1743.

The defendant argues that each daily newspaper is so unique as to occupy a product market of its own. This argument stems more from pride of publication than from commercial reality. The contention is made that if a reader in Southern California wants depth in international, national and regional news, he buys the Times and if he wants depth in the local news of his own community, he buys his small local paper. In effect, it is claimed that the Times and the surrounding local daily newspapers are complementary toward each other. As set forth previously, the concept of two products being complementary toward each other is not a barrier to § 7 if the effect of the merger may have anticompetitive effects. Federal Trade Commission v. Procter & Gamble Co., supra.

 It is now firmly established that products need not be identical to be included in a § 7 analysis of the product market. Furthermore, in Union Leader Corp. v. Newspapers of New England, Inc., 180 F.Supp. 125 (D.C.Mass.), modified, 284 F.2d 582 (1st Cir. 1960), cert. denied, 365 U.S. 833, 81 S.Ct. 747, 5 L.Ed.2d 744, the court of appeals recognized that numerous papers published all over New England could comprise a relevant daily newspaper market for both Clayton and Sherman Act purposes.

 Finally, when a merger such as here results in a share of from 10.6% to 54.8% of total weekday circulation, from 23.9% to 99.5% of total morning circulation and from 20.3% to 64.3% of total Sunday circulation in the relevant geographic market, the acquisition constitutes a prima facie violation of the Clayton Act. As set forth in United States v. Continental Can Co., supra:

> "Where a merger is of such a size as to be inherently suspect, elaborate proof of market structure, market behavior and probable anticompetitive effects may be dispensed with in view of § 7's design to prevent undue concentration." 378 U.S. at 458, 84 S.Ct. at 1748.

*Competition for Advertising.*

The Times competed with the Sun for advertising. The largest share of the revenue of a daily newspapre comes from its advertisements, and advertising is its lifeblood.

The Sun, before its acquisition by the Times, recognized that the Los Angeles metropolitan newspapers were their major competitors for national advertising. For many years prior to the merger, The Sun Company and its counterpart in adjoining Riverside County, the Riverside Press Enterprise, recognized that many advertisers thought their ads in the Los Angeles metropolitan papers adequately covered the San Bernardino-Riverside area and engaged in a joint national advertising campaign in order to dispel this idea. Ads were placed in industry advertising media to convince advertisers that if they wished to reach the San Bernardino-Riverside area they should place their ads in the Sun and Press Enterprise rather than in the Los Angeles metropolitan papers.

Likewise, the Times considered the Sun a competitor for advertising. The Times engaged in promotional advertising of its own to convince advertisers that ads placed in the Los Angeles Times are "a better buy than a carefully select-

ed group of Southern California dailies", which group included the Sun papers and the Riverside Press Enterprise.

In summary, prior to the merger both the acquiring and the merging companies recognized each other as their competitor for advertising. After the acquisition, the advertising campaign that both papers waged against each other ceased.

*The Geographic Market.*

It is necessary after defining the product market to determine the geographic market (the "section of the country") in order to determine the anticompetitive effect of the merger. Brown Shoe Co. v. United States, 370 U.S. at 324, 82 S.Ct. 1502.

In 1964 the year of the acquisition, the Times had a weekday daily circulation of 16,650 and a Sunday circulation of 31,993 within San Bernardino County. This amounted to 10.6% of the total weekday circulation for both morning and evening newspapers, 23.9% of total morning circulation and 20.3% of the total Sunday circulation.

The Sun had its entire circulation, except for a very few copies, within the limits of San Bernardino County. The county therefore encompasses virtually the entire area of circulation and home delivery overlap between the Times and the Sun.

Both the Sun and Times Mirror companies have for years recognized San Bernardino County as a daily newspaper market, and have regularly reported for advertisers' use such things as circulation, number of households, population and retail sales on a San Bernardino County basis. In 1964 the Times requested the Audit Bureau of Circulations to include all of San Bernardino County in its retail trading zone, thus recognizing the county as part of its market.

Newspapers and advertising industries such as Audit Bureau of Circulations, American Newspapers Market, Inc. and Standard Rate & Data Service recognize San Bernardino County as a newspaper market.

The Times Mirror Company, in evaluating the acquisition of the Sun, used the daily newspaper business in San Bernardino County as the relevant market area. It recognized San Bernardino County as the basic area of circulation overlap between the Times and the Sun. It treated the county as a daily newspaper market and determined the market share of the Times and Sun by computing their "percentage of field" against total daily newspaper circulation in San Bernardino County.

The defendant contends that the County of San Bernardino is not commercially realistic because county boundaries do not define the boundaries of a newspaper market. It claims that counties are political and administrative boundaries, not necessarily market boundaries. This contention may be true as a generalized statement. In each case the geographic market must be determined with sufficient precision to weigh the anticompetitive effects of the merger. The Times claims that the largest part of its circulation was in the west part of San Bernardino County, while the largest part of the circulation of the Sun was in the east part. However, as stated previously, the newspaper industry has recognized San Bernardino County as a daily newspaper market. Most important of all, the Times itself, in evaluating the acquisition, used the daily newspaper business in the entire San Bernardino County as the relevant market.

The defendant claims that by reason of the fact that until the level of 80% to 85% of circulation of both newspapers is reached, there is no geographical overlap between them and that, therefore, San Bernardino County is not a proper geographic market. It is claimed the rule of *Philadelphia Nat'l Bank* supra, is that only the first 75% of a company's business should be considered in determining whether there is any competitive overlap. That is not the holding. The problem in *Philadelphia Nat'l Bank* was not to determine whether the business of the acquired or acquiring

bank overlapped, since it was clear that they did, but to arrive at a particular delineation of their area of overlap. The Court held that a recognized four-county area which accounted for a substantial majority of the business of the two banks was a practical and proper market. The figure of 75% was cited to show that the relevant market encompassed most of the area of overlap, not that there must be an area of overlap before the 75% figure was reached.

In any event, San Bernardino County is a recognized market which encompasses not just 75% but almost all of the circulation overlap between the two newspapers.

The argument of defendant that the geographical overlap must occur before the two companies did 75% of their business is also contrary to a teaching found in Brown Shoe v. United States, supra. There, the following illustration was given:

> "If two retailers, one operating primarily in the eastern half of the Nation, and the other operating largely in the West, competed in but two mid-Western cities, the fact that the latter outlets represented but a small share of each company's business would not immunize the merger in those markets in which competition might be adversely affected." 370 U.S. at 337 n. 65, 82 S.Ct. at 1530.

The government in seeking a broad injunction asks not only must San Bernardino County be considered the relevant geographic market, but all of Southern California be such a market even though the Sun has a circulation of only an insignificant few papers outside San Bernardino County. Heavy reliance is placed on United States v. Bethlehem Steel Corp., 168 F.Supp. 576 (S.D.N.Y.1958), where the court stated:

> "Even in a case where two companies operate primarily in separate areas, a merger can have an adverse effect on competition in that the enhanced strength of the merged company may give it such an undue advantage in

each area that competition may be substantially lessened." 168 F.Supp. at 600.

The answer here is there was no evidence of the effect the merger would have in Santa Barbara, Ventura, Orange, San Diego or the other counties in Southern California with the exception of San Bernardino. The fact is the Times before the merger was so large and strong that its enhanced strength as the result of the merger was not significantly greater anyplace outside of San Bernardino County with the possible exception of Riverside County. The acquisition of Acme Colorprint Company may provide the anticompetitive effect in the entire Southern California market, but this was not stressed at the trial.

There was no demonstration that the purchase of the Sun by someone other than the Times could have any effect upon the daily newspaper business outside San Bernardino County. It would be stretching the doctrine of judicial knowledge beyond its breaking point for the court to find that if the Pulitzers had purchased the Sun, they could have created competition for the Times beyond San Bernardino County. They might have, but the record does not reveal it. The "entry into the field" concept is one of vital importance, particularly since Federal Trade Commission v. Procter & Gamble Co., supra, but to make the concept applicable in a particular case it must be supported by evidence.

*Concentration in the Industry.*

In United States v. Pabst Brewing Co., supra, the Court stated that "a trend toward concentration in an industry, whatever its causes, is a highly relevant factor in deciding how substantial the anti-competitive effect of a merger may be". 384 U.S. at 552–53, 86 S.Ct. at 1669. Similarly, in United States v. Philadelphia Nat'l Bank, supra, the Court held: "if concentration is already great, the importance of preventing even slight increases in concentration and so preserving the possibility of

eventual deconcentration is correspondingly great." 374 U.S. at 365 n. 42, 83 S.Ct. at 1742. Finally, in United States v. Von's Grocery Co., supra, neither the acquiring nor the acquired company had a dominant share of the market. Concentration of ownership was relatively low. Nevertheless, the Court found the acquisition to be violative of § 7 because there was a trend toward the decline of independent competitors in the industry and there was a trend toward acquisition in the industry. The Court, in United States v. Continental Can Co., supra, recognized the effects of a merger thusly:

"A merger * * * is significant not only for its intrinsic effect on competition but also for its tendency to endanger a much broader anticompetitive effect by triggering other mergers by companies seeking the same competitive advantages * * *." 378 U.S. at 464, 84 S.Ct. at 1750.

■ In determining the extent of concentration in the industry, inquiry is not limited to the relevant geographic market. In United States v. Philadelphia Nat'l Bank, supra, the Court determined that the section of the country which was relevant there was the metropolitan area consisting of Philadelphia and its three contiguous counties. Yet in discussing the trend toward concentration in the commercial banking business (the product market), the Court extensively discussed the trend throughout the United States, an area far outside the relevant geographic market. 374 U.S. at 325–326, 83 S.Ct. 1715. It is therefore proper here to discuss the trend of concentration not only in the relevant market of San Bernardino County but at least also in the larger area of Southern California where the Los Angeles Times circulates.

At the time of the acquisition, there was already a heavy concentration of daily newspaper ownership in the ten counties of Southern California. Four publishers (Times, Hearst, Copley and Ridder) accounted for 71% of all weekday daily newspaper circulation, and ten

publishers accounted for almost 85% of such circulation. Three (Times, Copley and Ridder) accounted for over 85% of all morning daily newspaper circulation and two (Times and Hearst) accounted for about 66% of all Sunday circulation.

In the five-county area of Los Angeles County and its immediate surrounding counties, the top four publishers (Times, Hearst, Ridder and Freedom) accounted for 73% of all weekday daily circulation, while the top ten publishers accounted for 89% of the total. In this five-county area, the Los Angeles Times alone accounted for 80% of all morning daily circulation in 1964; the top four morning publishers accounted for over 96% of such circulation, while the top four Sunday newspaper publishers accounted for 86% of all Sunday circulation.

There has been a steady decline of independent ownership of newspapers in Southern California. A newspaper is independently owned when its owners do not publish another newspaper at another locality. In San Bernardino County as of January 1, 1952, six of the seven daily newspapers were independently owned. On December 31, 1966, only three of the eight dailies published there remained independent.

In the Greater Los Angeles five-county market (Los Angeles and four surrounding counties) from January 1, 1952, through December 31, 1966, while the number of daily newspapers increased from 52 to 64, the number of independent dailies decreased from 33 to 14. In 1952, 63% of all daily newspapers in this five-county area were independent; in 1966, only 22% were independent.

In the ten-county area of Southern California in the same period of time, the number of daily newspapers increased from 66 to 82, but the number independently owned decreased from 39 to 20. In 1952, 59% of Southern California dailies were independent; in 1966 only 24% were independent.

The acquisition of the Sun by the Times was particularly anticompetitive because it eliminated one of the few independent papers that had been able to operate successfully in the morning and Sunday fields. Traditionally, most newspapers in Southern California have been evening papers, one reason being the strength of the Los Angeles Times' circulation throughout Southern California. In 1956 only 8 of the 36 newspaper publishers in Southern California had morning papers, and of these only the Riverside Press Enterprise was still independently owned. The morning field was dominated by the Times, which accounted for 70% of Southern California's morning circulation.

In San Bernardino County, as the result of the acquisition, Times Mirror's share of the 1964 market increased from 10.6% to 54.8% of total weekday daily circulation, from 23.9% to 99.5% of morning circulation and from 20.3% to 64.3% of Sunday circulation. In United States v. Philadelphia Nat'l Bank, supra, the Court stated: "Without attempting to specify the smallest market share which would still be considered to threaten undue concentration, we are clear that 30% presents that threat." 374 U.S. at 364, 83 S.Ct. at 1742.

In San Bernardino County the following events have taken place since the acquisition:

1. On March 31, 1965, the Richardson Newspapers, publishers of the Pomona Progress Bulletin, purchased the Ontario-Upland Report.

2. On October 1, 1965, the Colton Courier ceased daily publication.

3. On April 1, 1966, the Rialto Record-News quit the daily newspaper field.

4. On May 8, 1967, the Lake Union Publishing Company, partially owned by the Scripps League, acquired the Fontana Herald-News, theretofore an independent daily. The Fontana and Ontario-Upland newspapers were the next two largest independent dailies after the Sun.

The acquisition has raised a barrier to entry of newspapers in the San Bernardino County market that is almost impossible to overcome. The evidence discloses the market has now been closed tight and no publisher will risk the expense of unilaterally starting a new daily newspaper there.

■ An acquisition which enhances existing barriers to entry in the market or increases the difficulties of smaller firms already in the market is particularly anticompetitive. In Federal Trade Commission v. Procter & Gamble Co., supra, one of the two major grounds on which the Court condemned the acquisition was "the substitution of the powerful acquiring firm for the smaller, but already dominant, firm may substantially reduce the competitive structure of the industry by raising entry barriers and by dissuading the smaller firms from aggressively competing." 386 U.S. at 578, 87 S.Ct. at 1230.

The difficulty of entry anyplace within the Southern California daily newspaper market is illustrated best by the recent failure of one of the most powerful publishers in the United States, the New York Times, to successfully establish a West Coast edition.

*Domination Over the Acquired Company.*

The evidence clearly establishes that the defendant has taken active control of The Sun Company and has exercised control in such areas as the selection of top management, the editorial content and the advertising policy of the paper.

Within two months of the acquisition, the old Board of Directors of The Sun Company was supplanted by a new Board on which officers and executives of The Times Mirror Company constituted a majority. The positions of Secretary, Treasurer and Assistant Secretary-Treasurer were filled by executives of the defendant. Six months later James A. Guthrie was replaced as president of The Sun Company by Otis Chandler, publisher of the Times.

After the acquisition, the Sun stopped its joint advertising campaign with the

Riverside Press Enterprise against the Los Angeles metropolitan papers. This change occurred as the result of suggestions from executives of the Times.

■ There is a legal presumption that when one corporation achieves control of another, there is an elimination of competition between them. United States v. Pennzoil Co., 252 F.Supp. 962, 984 (W.D.Pa.1965); cf. United States v. Continental Can Co., 378 U.S. at 463, 84 S.Ct. 1738, 12 L.Ed.2d 953; United States v. E. I. du Pont de Nemours & Co., 353 U.S. at 60507, 77 S.Ct. 872, 1 L.Ed.2d 1057.

*Conclusion.*

· The acquisition by The Times Mirror Company of The Sun Company on June 25, 1964, resulted in a violation of § 7 of the Clayton Act. It is an acquisition by one corporation (The Times Mirror Company) of all the stock of another corporation (The Sun Company), both corporations being engaged in interstate commerce, whereby in the daily newspaper business (the relevant product market) in San Bernardino County, California (the relevant geographic market), the effect is substantially to lessen competition.

*Form of Relief.*

The government seeks an order of divestiture and an injunction prohibiting the defendant from acquiring any other daily newspaper in the relevant geographic market.

Divestiture has become the normal form of relief when acquisitions have been found to violate § 7 of the Clayton Act. As stated in United States v. E. I. du Pont de Nemours & Co., 366 U.S. 316, 81 S.Ct. 1243, 6 L.Ed.2d 318 (1961):

"It cannot be gainsaid that complete divestiture is peculiarly appropriate in cases of stock acquisitions which violate § 7. That statute is specific and 'narrowly directed,' Standard Oil Co. [of California and Standard Stations] v. United States [1949], 337 U.S. 293, 312 [69 S.Ct. 1051, 1061, 93 L.Ed. 1371], and it outlaws a particular form of economic control—stock acquisitions which tend to create a monopoly of any line of commerce. The very words of § 7 suggest that an undoing of the acquisition is a natural remedy. Divestiture or dissolution has traditionally been the remedy for Sherman Act violations whose heart is intercorporate combination and control, and it is reasonable to think immediately of the same remedy when § 7 of the Clayton Act, which particularizes the Sherman Act standard of illegality, is involved." 366 U.S. at 328–30, 81 S.Ct. at 1251–52.

■ Complete divestiture here is the practical solution to correct the § 7 violation.

However, the request for a perpetual injunction must be denied. The enthusiasm with which the government seeks this relief is recognized, particularly as against such a dominant company in the newspaper business as The Times Mirror Company. However, the teaching of *Brown Shoe* must be remembered. In speaking of the history of § 7 and the intent of Congress, the Court set forth:

"[A]t the same time that it sought to create an effective tool for preventing all mergers having demonstrable anticompetitive effects, Congress recognized the stimulation to competition that might flow from particular mergers. When concern as to the Act's breadth was expressed, supporters of the amendments indicated that it would not impede, for example, a merger between two small companies to enable the combination to compete more effectively with larger corporations dominating the relevant market, nor a merger between a corporation which is financially healthy and a failing one which no longer can be a vital competitive factor in the market. * * * Taken as a whole, the legislative history illuminates congressional concern with the protection of *competition*, not *competitors*, and its desire to restrain mergers only to the extent that such combinations may tend to lessen competition." 370 U.S. at 319–20, 82 S.Ct. at 1521.

While it is recognized that injunctive relief has been granted in antitrust cases, the court is not able to predict the future of the daily newspaper business in San Bernardino County. For example, on May 1, 1967, the Victorville Daily Press, a weekly, became a daily and the government admits "it is a bit early to predict what its fate will be". In the event that it should become a failing paper and the defendant acquired it, a study must be made of the effect of the acquisition. It may be anticompetitive, or it may come within the congressional exemption as expressed in *Brown Shoe*. Based upon the evidence before it, the court cannot prejudge the newspaper business with sufficient certainty to grant the injunction. The dangers that could result from it outweigh any possible advantage that it may have.

*Findings of Fact and Conclusions of Law:*

Pursuant to the provisions of Rule 52 of the Federal Rules of Civil Procedure, this opinion shall constitute the findings of fact and conclusions of law of the court.

*Judgment.*

It is the judgment of this court and the same is directed to be prepared separately and entered under Rule 58 of the Federal Rules of Civil Procedure as follows:

It is adjudged and decreed—

1. That the acquisition and ownership of stock of The Sun Company by the defendant, The Times Mirror Company, is in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

2. That the defendant is directed to divest itself of the stock of The Sun Company and shall not thereafter in any form or manner acquire any interest in or control over The Sun Company.

3. That the defendant shall within 60 days from the date this judgment becomes final lodge with the court a plan for divestiture which shall provide for the continuation of The Sun Company as a strong and viable company.

4. That divestiture shall be in accordance with such orders as the court directs.

5. That the court shall retain jurisdiction over the parties with reference to the action to make such further orders as may be proper to carry out the judgment.

6. That the plaintiff shall recover its costs of this action.